ADVISORY OPINION *re* CONSTITUTIONALITY OF 1973 PA 1
AND 2

OPINION OF THE COURT

1. TAXATION—BONDS—STATES—LOANS—SCHOOLS AND SCHOOL DIS-
   TRICTS—CAPITAL EXPENDITURES.

   The power to tax for the repayment of principal and interest, on
   bonds pledging the full faith and credit of the State of Michi-
   gan for the purpose of making loans to school districts for
   funding capital expenditures and for school district bonds for
   repayment of the loan under a section of an article of the
   Michigan Constitution, is expressly without limitation as to
   rate or amount (Const 1963, art 9, § 16).

2. SCHOOLS AND SCHOOL DISTRICTS—STATUTES—CONSTITUTIONAL LAW
   —STATE BORROWING—LOANS—CAPITAL EXPENDITURES.

   A school financing plan provided for in certain public acts is not
   one authorized by constitutional provisions for state short term
   borrowing and long term borrowing, and because it is not for
   funding capital expenditures but operating deficits, is not au-
   thorized by the constitutional provision authorizing borrowing
   for the purpose of making loans to school districts for funding
   capital expenditures and for school district bonds for repay-
   ment of the loan (Const 1963, art 9, §§ 14–16; 1973 PA 1 and 2).

3. BONDS—SPECIAL OBLIGATION BONDS—TAXATION—CONSTITUTIONAL
   LAW—STATE INDEBTEDNESS.

   The concept of "special obligation" bonds payable out of taxes
   levied for the privilege of use came to be recognized as another
   exception to the constitutional limitation on the incurment of
   state indebtedness and, whatever the logic of it, the Michigan
   Supreme Court is committed to its acceptance, since the people,

REFERENCES FOR POINTS IN HEADNOTES
[1–4, 6–8, 10, 16, 17, 19, 20] 64 Am Jur 2d, Public Securities and
   Obligations §§ 78, 82, 120–122.
[5] 49 Am Jur, States, Territories, and Dependencies § 64 *et seq.*
[9] 16 Am Jur 2d, Constitutional Law §§ 26–29.
[11–15, 18] 51 Am Jur, Taxation § 119.

presumably aware of the exception, did not eliminate it in the 1963 Constitution.

4. SCHOOLS AND SCHOOL DISTRICTS—STATUTES—LOANS—BONDS—REVENUE BONDS—SPECIAL OBLIGATION BONDS—TAXATION—PRIVILEGE TAXES—INCOME TAXES—AD VALOREM TAXES.

A plan for financing operating deficits in school districts proposed by certain public acts does not comprehend repayment of the loan from revenue derived from the operation of a·facility or for repayment of the loan from privilege taxes levied on users of the facility; therefore, they are not "revenue bonds" and are not "special obligation" bonds; those loans will be repaid from general taxes, an income tax or an ad valorem tax or payments received from the school aid fund made up of constitutionally dedicated sales tax revenue and appropriations largely derived from general taxation (1973 PA 1 and 2).

5. CONSTITUTIONAL LAW—STATE INDEBTEDNESS—SUPREME COURT.

The Michigan Supreme Court is not disposed to extend exceptions to the constitutional limitation proscribing the issuance of any state indebtedness except for debts authorized pursuant to the constitution (Const 1963, art 9, § 12).

6. SCHOOLS AND SCHOOL DISTRICTS—STATUTES—STATES—STATE BORROWING—LOANS—TAXATION—STATE TREASURER—NOTES—SALES TAX.

Under a plan for financing operating deficits in school districts embodied in two public acts the borrower is the state, although the borrowed funds will not be used directly by the state but will be lent to a school district, and the several loans contemplated, to the State Treasurer and by him to the school district, have been structured so that the indebtedness will be repaid, not by the people of the state at large, but primarily by residents of the school district through added taxation; the State Treasurer has the obligation to see to it that principal and interest installments falling due on the state notes are paid and, if there is a default in the payment of the school district's notes, he is required to use state sales tax revenues allocable to the school district to cure the default.

7. SCHOOLS AND SCHOOL DISTRICTS—STATUTES—STATES—STATE BORROWING—AUTHORITY—BONDS—HIGHWAY BONDS—TAX ANTICIPATION BONDS—REVENUE BONDS—PRIVILEGE TAXES—CONSTITUTIONAL LAW.

Under a plan for financing operating deficits in school districts embodied in two public acts the borrower is the State of

Michigan, not "an authority"; the state notes proposed to be sold are not highway bonds to be paid only from privilege taxes levied against users; they are not tax anticipation bonds; they are not revenue bonds (Const 1963, art 9, § 13).

8. SCHOOLS AND SCHOOL DISTRICTS—STATES—NOTES.

State notes involved under two public acts which provide a plan for financing operating deficits in school districts are direct obligations of the state (1973 PA 1 and 2).

9. CONSTITUTIONAL LAW—STATE BORROWING—SUPREME COURT.

If the constitutional limitation on state borrowing is to be removed from the Michigan Constitution it should be done by the free informed choice of the electorate rather than by decisions of the Michigan Supreme Court (Const 1963, art 9, § 12).

10. TAXATION—BONDS—CAPITAL EXPENDITURES—DEFICITS—CONSTITUTIONAL LAW—SCHOOLS AND SCHOOL DISTRICTS—MILLAGE—AD VALOREM TAXES.

The limitations of a section of an article of the Michigan Constitution providing for a 15-mill tax limitation do not apply, whether the purpose of an authorized school financing bond issue be for the funding of capital expenditures or the funding of accumulated operating deficits, and non-voted millage may be levied to pay principal and interest on such bonds; the limitations do apply to ad valorem taxation for purposes other than levies to pay principal and interest on bonds or other evidences of indebtedness (Const 1963, art 9, § 6).

11. TAXATION—CONSTITUTIONAL LAW—15-MILL LIMITATION—AD VALOREM TAXES.

What purports to be a 15-mill general ad valorem tax limitation upon real and tangible personal property in the first paragraph of a section of the Michigan Constitution is, if not illusory, certainly a much more miniscule limitation than was depicted in the Address to the People accompanying the proposed 1963 Constitution (Const 1963, art 9, § 6).

12. TAXATION—CONSTITUTIONAL LAW—15-MILL LIMITATION—COUNTIES —TOWNSHIPS—SCHOOLS AND SCHOOL DISTRICTS—BONDS—CONTRACT OBLIGATIONS.

The limitations of the first paragraph in the state Constitution regarding a 15-mill limitation on ad valorem taxes apply to counties, townships, and school districts, and all of the operations of such governmental units except for authorized opera-

tions of such units involving bonds or other evidences of indebtedness or other obligations in anticipation of which bonds were issued (Const 1963, art 9, § 6).

13. TAXATION—SUPREME COURT—CONSTITUTIONAL LAW—15-MILL LIMITATION—SCHOOLS AND SCHOOL DISTRICTS.

Neither a decision of the Michigan Supreme Court nor the nonapplication of limitation provision in a section of an article of the Michigan Constitution has nullified the 15-mill tax limitation; it still applies to millage used to cover current operating needs of a school district; if the millage allocated to the school district within the 15-mill limitation is not adequate to cover such needs, additional millage may be levied only if approved by a majority of the electors voting on the question (Const 1963, art 9, § 6).

14. STATUTES—LEGISLATURE—DEFICIT SPENDING—BONDS—INDEBTEDNESS.

The Legislature may impose whatever limitations it deems necessary to prevent deficit spending and the issuance of bonds and other evidences of indebtedness.

15. CONSTITUTIONAL LAW—COUNTIES—BORROWING—ASSESSED VALUATION—LEGISLATURE—STATUTES—DEFICITS.

The borrowing capacity of local units of government, with the exception of counties which may not incur indebtedness in excess of 10% of assessed valuation, is not limited by the Michigan Constitution; but state constitutions are historically intended to provide limitations on an otherwise omnipotent Legislature and the Legislature in turn is expected to protect the people by appropriate legislation from deficit spending by local units of government (Const 1963, art 7, § 11).

16. SCHOOLS AND SCHOOL DISTRICTS—STATUTES—STATE INDEBTEDNESS —STATES—NOTES—DEFICITS—15-MILL LIMITATION—CONSTITUTIONAL LAW.

A plan for financing operating deficits in school districts, embodied in two public acts, violates the constitutional limitation proscribing the issuance of any state indebtedness except for debts authorized pursuant to the constitution insofar as it provides for the issuance of state notes, but the provision of the plan for repayment with non-voted millage of school district notes issued to fund accumulated operating deficits does not violate another section of that article providing for a 15-mill limitation on certain taxation (Const 1963, art 9, §§ 6, 12).

Concurring Opinion
Williams, J.

See headnotes 1-9.

17. Schools and School Districts—Supreme Court—Judicial No-
    tice—Senate—Constitutional Law—Bonds—Taxation—
    Statutes—Deficits—Notes—Ad Valorem Taxes—Millage.

*Michigan Supreme Court can take judicial notice of the fact that
the Senate's real concern is whether the City of Detroit school
system can constitutionally bond and tax under sections of a
statute providing that a school district having an "operating or
projected operating deficit in excess of $100.00 per membership
pupil may borrow a sum of not more than $75,000,000.00 and
issue its negotiable interest bearing notes or bonds for the
purpose of funding the deficit" and that "[t]he notes or bonds
shall pledge primarily for their payment \* \* \* [r]eceipts de-
rived from the levy and collection of an ad valorem tax levied
upon all taxable real and personal property within the district
of not more than 2.25 mills for each year the notes or bonds
are outstanding"; the reason such judicial notice is taken is
that the Detroit schools have an accumulated "operating deficit
in excess of $100.00 per membership pupil" which means that
the Court does not need to consider the more speculative part
of the statute "or projected operating deficit" (MCLA 340.681).*

18. Taxation—Bonds—Constitutional Law—15-Mill Limitation—
    Deficits.

*Michigan Supreme Court should recognize that a section of an
article of the Michigan Constitution imposing a 15-mill tax
limitation permits bonding and taxing without limitation for
accumulated deficits, even if of operational origin, but the
Court should reserve for future consideration when the facts so
require whether the second, "nonapplication" paragraph of
that section so modifies the first 15-mill paragraph as to permit
bonding and taxing without limitation for current and future
operations as well (Const 1963, art 9, § 6).*

Opinion Concurring In Part and Dissenting In Part
T. M. Kavanagh, C. J.

See headnotes 5 and 9.

19. Schools and School Districts—Indebtedness—Statutes—Notes
    —Constitutional Law.

*A plan for financing operating deficits in school districts, embod-*

ied in two public acts, violates the constitutional limitation
proscribing the issuance of any state indebtedness except for
debts authorized pursuant to the constitution insofar as it
provides for the issuance of state notes (Const 1963, art 9, § 12;
1973 PA 1 and 2).

20. Schools and School Districts—Operating Expense—15-Mill
Limitation—Deficit—Unvoted Millage.

An indebtedness of a school district which is "operating ex-
penses" is not changed from an operating expense that is
subject to the constitutional 15-mill tax limitation to an operat-
ing deficit which can be paid from unvoted millage by allowing
the deficit to run for more than one year (Const 1963, art 9,
§ 6).

Request by the Senate for an advisory opinion as
to constitutionality of 1973 PA 1 and 2. Submitted
May 18, 1973. (No. 17 May Term 1973, Docket
Nos. 54,722, 54,723.) Statutes declared unconstitu-
tional in part and constitutional in part October
17, 1973.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, and *Eugene Kra-
sicky* and *Gerald F. Young,* Assistants Attorney
General, supporting constitutionality.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, and *George L. Mc-
Cargar,* Assistant Attorney General, opposing con-
stitutionality.

T. G. Kavanagh, J. In response to the requests
of the Senate of the State of Michigan, made in
accordance with Const 1963, art 3, § 8, requesting
the opinion of the Supreme Court as to the consti-
tutionality of 1973 PA 1 and 1973 PA 2, on April
16, 1973 we issued the following order:

"On order of the Court, the requests of the Senate of
the State of Michigan made pursuant to section 8,

article 3 of the Michigan Constitution of 1963 to render opinions on the following questions of law:

" 'Does the State of Michigan violate Sections 14, 15 or 18 of Article 9 of the Michigan Constitution of 1963 if it borrows money and issues notes, pursuant to Section 139 of Act No. 258 of the Public Acts of 1972, as added by Act No. 2 of the Public Acts of 1973, being Section 388.1239 of the Compiled Laws of 1970, the proceeds of which shall be used for loans to certain school districts pursuant to Section 138 of Act No. 258 of the Public Acts of 1972, as added by Act No. 2 of the Public Acts of 1973, being Section 388.1238 of the Compiled Laws of 1970?

" 'Is a school district subject to the 15 mill limitations of Section 6 of Article 9 of the Michigan Constitution of 1963 if it imposes an ad valorem tax to pay principal and interest on notes or bonds issued to fund present or projected operating deficits as provided in Section 681 of Act No. 269 of the Public Acts of 1955, as amended by Act No. 1 of the Public Acts of 1973, being sections *[sic]* 340.681 of the Compiled Laws of 1970?'

are hereby granted. It is further ordered that the Attorney General of the State of Michigan be requested to brief both sides of these questions. One brief and argument to be directed to the constitutionality of the acts and one brief and argument to be presented as to why the acts should be held unconstitutional. The Attorney General's brief supporting constitutionality shall be filed in typewritten form by May 2, 1973, and his brief opposing constitutionality shall be filed by May 17, 1973. Printed briefs as required by GCR 1963, 857, shall be filed in substitution for the typewritten copies, as soon as practicable. This matter shall be presented to the Court, without oral argument, in accordance with the rules of practice on appeals to this Court."

In compliance with our order, the Attorney General filed briefs and presented argument for and against the constitutionality of the legislation.

Both sides agree and it was conceded in argument that §§ 14, 15 and 18 of art 9 were not

applicable to the bond issues contemplated in the subject legislation, but it was argued and briefed by the opponents of constitutionality that these sections did not exhaust the possibilities of constitutional infirmity. It was urged that § 12 of art 9 must also be considered in order to determine the constitutionality of the legislation.

We agree, for we are convinced, in light of the language of § 2 of each of the acts " * * * the legislature requests the opinion of the supreme court as to the constitutionality of this act", that the intent of the request was to encompass all of the sections of art 9 bearing on the constitutional question. Accordingly we include § 12 in our consideration.

We do so also because we judicially notice that steps have already been taken to effectuate the financing plan intended by the legislation. The state has loaned the School District of Detroit $30,000,000 pursuant to the first operative paragraph of 1973 PA 2 (MCLA 388.1238; MSA 15.1919 [638]), that paragraph requires repayment of the money within 180 days. The acts contemplate the sale of state notes in an amount sufficient to reimburse the treasury not only for that $30,000,-000 but also to permit an additional loan of up to $45,000,000 to cover the full deficit of the Detroit School District, which has been determined to be $73,000,000 as of June 30, 1973.

We are further advised that the proposed issue of state notes of up to $75,000,000 cannot be sold until this Court renders an advisory opinion. If we advise the Senate that the state may not borrow money in accordance with the plan, some other plan must be promptly developed to accomplish the object sought by this legislation.

*THE CONSTITUTIONAL LIMITATIONS*

Article 9 of the Constitution of 1963 treats of finance and taxation. It makes specific provision for state borrowing (§§ 14, 15, 16) and proscribes the issuance of any evidence of state indebtedness except for debts authorized pursuant to the Constitution (§ 12). It also forbids the granting of the credit of the state except as authorized in the Constitution (§ 18).

Section 14 authorizes short term borrowing to meet obligations incurred pursuant to appropriations for any fiscal year and the issuance of the state's full faith and credit notes pledging undedicated revenues to be received during the same fiscal year. This short term borrowing power is limited to 15% of the undedicated revenues and the debt must be repaid as the revenues are received but no later than the end of the fiscal year.

Section 15 authorizes long term borrowing for specific purposes but the purpose, amount, and method of repayment of the debt must be submitted to and approved by the electors.

Section 16 authorizes borrowing for the purpose of making loans to school districts for funding capital expenditures. It contemplates the issuance of state notes or bonds pledging its full faith and credit and also the issuance of school district bonds for repayment of the loan according to the provisions therefor specified by the Legislature. In this connection it is noteworthy that the power to tax for the repayment of principal and interest on such bonds is expressly without limitation as to rate or amount.

Manifestly the financing plan provided for in PA 1 & 2 of 1973 is not one authorized by §§ 14 or 15, and because it is not for funding capital expendi-

tures but operating deficits, is not authorized by § 16.

Accordingly then we must determine whether the plan for state borrowing to establish the loan fund creates a "debt" of the state, for if not § 12's injunction would have no application and—unless the plan be deemed to provide a grant of state credit—would not be barred by § 18.

## THE PLAN

In essence the plan provides:

(1) The State Treasurer will borrow up to $75,000,000 to create a fund to loan to school districts having an operating or projected operating deficit in excess of $100 per pupil. (The Detroit deficit exceeds $250 per pupil.) 1973 PA 2 provides that the state notes "shall not be a general obligation of the state, shall not pledge the full faith and credit of the state and shall not be an indebtedness of the state within the meaning of any constitutional limitation on state indebtedness, but shall be payable solely and only from the payments of principal and interest on the loans made by the state treasurer to a district or districts as provided in this section." MCLA 388.1239; MSA 15.1919(639).

(2) The state notes are to mature serially with annual maturities in not more than ten years. The notes of the school district to the state are to have corresponding maturities and pledge for their payment "any funds of the district legally available therefor," including a newly-levied income tax of not exceeding 1% or a newly-levied ad valorem tax of not more than 2.25 mills (the power to levy such taxes being provided in 1973 PA 1), and as secondary security future "state aid moneys and any

other funds of the district legally available therefor." MCLA 388.1239(6), 340.681(4); MSA 15.1919(639)(6), 15.3681(4).

(3) The school district must authorize the State Treasurer, and in the event of default the Treasurer is required, to deduct from the next state school aid payment of the district an amount equal to the amount in default. MCLA 388.1239(7); MSA 15.1919(639)(7).

## *OPINION REGARDING BORROWING BY THE STATE*

The idea that some borrowed money is not a debt comes from cases approving the funding of "self-liquidating public works" through "revenue bonds".

The history and theory of the "revenue bond" exception is set forth in detail in *Young v Ann Arbor,* 267 Mich 241; 255 NW 579 (1934), and reaffirmed and extended in *Attorney General, ex rel Eaves, v State Bridge Commission,* 277 Mich 373; 269 NW 388 (1936).

This latter case was followed and expanded in *State Highway Commission v Detroit Controller,* 331 Mich 337; 49 NW2d 318 (1963), where the "revenue bond" concept was applied to "analogous" bonds which looked for repayment only to the highway fund made up of vehicular "privilege" taxes levied on users of highways built with proceeds of the bonds.

Thus, the concept of "special obligation" bonds payable out of taxes levied for the privilege of use came to be recognized as another exception to the constitutional limitation on the incurment of state indebtedness and, whatever the logic of it, we are committed to its acceptance, since the people,

presumably aware of the exception, did not elimi-
nate it in the 1963 Constitution. See *Schureman v
State Highway Commission,* 377 Mich 609; 141
NW2d 62 (1966).

The plan proposed by the acts now before us
does not comprehend repayment of the loan from
revenue derived from the operation of a facility.
These are not "revenue bonds".

The plan does not provide for repayment of the
loan from privilege taxes levied on users of the
facility. These are not "special obligation" bonds.

These loans will be repaid from general taxes,
an income tax or an ad valorem tax or payments
received from the school aid fund made up of
constitutionally dedicated sales tax revenue and
appropriations largely derived from general taxa-
tion.

We are not disposed to extend exceptions to this
constitutional limitation. Each extension seems to
invite another. Given the ingenuity of those who
urge avoidance of the limitation, we could effec-
tively eliminate it altogether by extending excep-
tions to it.

Although the borrowed funds will not be used
directly by the state but will be lent to a school
district, and the several loans contemplated (to the
State Treasurer and by him to the school district)
have been structured so that the indebtedness will
be repaid, not by the people of the state at large,
but primarily by residents of the school district
through added taxation,[1] the borrower is the state.
It is the obligation of the State Treasurer to see to
it that principal and interest installments falling
due on the state notes are paid and, if there is a

---

[1] A large proportion of ad valorem taxes is paid by nonresident
persons and corporations. The newly-authorized school district income
tax may be levied on corporations and resident individuals. MCLA
340.689(1); MSA 15.3689(1).

default in the payment of the school district's notes, he is required to use state sales tax revenues allocable to the school district to cure the default.

The argument in support of the constitutionality of this legislation would use the non-debt doctrine as a lever to change the plain meaning of the term "state indebtedness", limiting that term to indebtedness which constitutes a general obligation of the state supported by its full faith and credit. We are told that the focus should be on the source of repayment, that the question is not whether the state borrowed the money but rather the manner of contemplated repayment. Thus it is proposed to make the exception the rule. The camel having gotten its nose under the tent for revenue bonds, and this having been extended to users' privilege tax bonds, we are now asked to hold that henceforth the state can incur indebtedness as long as it withholds its full faith and credit and has limited repayment to a carved-out portion of general tax revenues set aside and called a special fund. It is proposed, thus, by reasoning from one analogy to another, to enable the state to borrow whatever amounts may be desired without limitation through the expedient of issuing non-debt obligations repayable out of special tax funds.

On the floor of the convention Mr. Brake distinguished between "general obligation indebtedness" and "various forms of borrowing used in connection with state government but not actually by state government," citing as examples State Highway Department borrowing, tax anticipation bonds, revenue bonds and a building "built by an authority". 1 Official Record, Constitutional Convention 1961, p 605. The state notes now proposed to be sold are not highway bonds to be paid only

from privilege taxes levied against users; they are not tax anticipation bonds (art 9, § 14); they are not revenue bonds. The borrower is not "an authority" but the State of Michigan.

Dubbing the users' privilege tax bonds dealt with in the State Highway Commissioner cases "special obligation bonds" does not expand the scope of the exception created by those cases.

The question is not whether the state has pledged its full faith and credit to pay the notes to be issued by the State Treasurer, but whether the notes are state indebtedness. The framers used the term "full faith and credit" in §§ 14 and 16 of art 9 and the term "general obligation bonds" in § 16 of art 9. If they intended to prohibit only the issuance of general obligation bonds or full faith and credit obligations presumably they would have used those terms in § 12 of art 9 rather than the term "state indebtedness".

The state notes here involved, in contrast with the notes of the State Housing Development Authority dealt with in the *Advisory Opinion re Constitutionality of PA 1966, No 346,* 380 Mich 554, 563; 158 NW2d 416 (1968), are direct obligations of the state. It is not contemplated that they will be repaid with revenue but with taxes. The taxes are levied generally, not merely against users of facilities to be constructed with the proceeds of the bonds. The bonds in that case are more closely akin to revenue bonds or users' privilege tax bonds than the bonds in this case. Pertinent is the following observation in the opinion of the Court in that case:

"The framers of the 1963 Constitution created a pay-as-you-go government for the State of Michigan."

Because these state notes evidence state in-

debtedness we need not consider whether the plan also constitutes a grant of state credit proscribed in § 18.

We are not unmoved by the argument of those who say that this limitation imbedded in the Constitution is self-deceiving, in that it only serves to increase the cost of borrowing in this day when borrowing is recognized as a legitimate and sometimes necessary method of governmental financing. But if this limitation is to be removed from the Constitution it should be done by the informed choice of the electorate rather than by our decisions.

## OPINION REGARDING NON-VOTED MILLAGE

We are also asked to express our opinion on whether the ad valorem tax authorized by 1973 PA 1 is subject to the millage limitation of art 9 § 6.

The School District of Detroit is not borrowing to fund current or future deficits, but past deficits —deficits which from one school fiscal year to another have been largely funded through borrowings on the strength of revenues expected to be received in the next fiscal year. It is proposed to replace the diversion of current income resulting from the obligation to pay this accumulated short-term borrowing with new long-term borrowing and thereby to refinance the previously incurred deficits.

Noteworthy is that the power of the state to authorize a school district to borrow money to pay operating deficits is not challenged. Nor is it claimed that operating deficit indebtedness may not be repaid with non-voted income taxes levied by the school district. It is claimed only that such

indebtedness may not be serviced with non-voted millage.

We considered the effect of § 6 in *Butcher v Grosse Ile Twp,* 387 Mich 42; 194 NW2d 845 (1972). There we held that by reason of the "nonapplication of limitation" language of § 6 there is no constitutional limitation on the amount of ad valorem taxation that may be imposed to pay debt service on bonds or other evidences of indebtedness.

In *Butcher* this Court rejected contentions that voted millage could be levied to pay principal and interest on bonds or other evidences of indebtedness only when the bond or other evidence of indebtedness

—has been authorized by the vote of the taxpayers,

—when issued, was expected to be paid without resort to non-voted millage,

—is in default because of nonpayment of principal or interest or, unless non-voted millage is levied, will be in default.

Now that those refinements have been rejected others are urged. It is contended that the nonapplication provision permits the levy of non-voted millage to pay bonds or other evidences of indebtedness issued to fund or refinance operating deficits only when

—the deficit was not anticipated and, thus, not budgeted,

—the bond or other evidence of indebtedness is of a kind that had been authorized by the Legislature and, thus, presumably in contemplation when the 1963 Constitution was adopted *(cf. Bacon v Kent-Ottawa Metropolitan Water Authority,* 354 Mich 159; 92 NW2d 492 [1958]), like the *short-term* tax anticipation notes authorized by 1943 PA 202; MCLA 134.1 *et seq.;* MSA 5.3188(13) *et seq.*

There was no discussion on the floor of the convention of the nonapplication provision. It was adopted as part of a compromise substituted for an earlier-adopted proposal which would have eliminated the 15-mill limitation altogether. 1 Official Record, Constitutional Convention 1961, pp 927–928, 2 Official Record, Constitutional Convention 1961, pp 2628–2631. The compromise restored the 15-mill limitation but made it inapplicable to taxes imposed to pay debt service on bonds or other evidences of indebtedness. We have no basis for moderating the simple and clear language used to express this compromise. We have been presented with nothing justifying a departure from the "natural and ordinary meaning" of the words used in the Constitution. See Cooley, Constitutional Limitations (6th ed), ch 4, p 73.

The suggestion that the nonapplication provision was meant to apply to obligations issued for monies used to pay capital expenditures but not to obligations that have been incurred because of operating deficits, strikes us as much the same kind of argument we have just rejected when urged by those who favor extending the non-debt borrowing doctrine.

In both cases persons dissatisfied with the scope of the constitutional language ask us to create exceptions which they assert will better serve the public interest.

But both the provisions limiting the state's power to incur indebtedness and the nonapplication provision are stated in language which is crystal clear. "No evidence", says the Constitution, of state indebtedness shall be issued except for debts authorized pursuant to the Constitution. The millage limitations, says the Constitution, "shall not apply" to taxes imposed for the payment of

principal and interest on bonds or other evidences of indebtedness. There is simply no room to engraft the kind of well-meaning exceptions which those dissatisfied with this clear and unqualified language would add.

It is our opinion that whether the purpose of the authorized bond issue be for the funding of capital expenditures, or as contemplated here, the funding of accumulated operating deficits, the limitations of art 9, § 6 do not apply and non-voted millage may be levied to pay principal and interest on such bonds.

The limitations do apply to ad valorem taxation for purposes other than levies to pay principal and interest on bonds or other evidences of indebtedness. We repeat what Justice ADAMS said in *Butcher* (p 66):

"[W]hat purports to be a 15-mill general ad valorem tax limitation upon real and tangible personal property in the first paragraph of § 6 is, if not illusory, certainly a much more miniscule limitation than was depicted to the people in the Address to the People accompanying the proposed 1963 Constitution. The limitations of the first paragraph do apply to counties, townships and school districts, and all of the operations of such governmental units, except for authorized operations of such units involving bonds or other evidences of indebtedness or assessments or contract·obligations in anticipation of which bonds were issued."

Neither *Butcher* nor the non-application of limitation provision has nullified the 15-mill limitation. It still applies to millage used to cover current operating needs of a school district; if the millage allocated to the school district within the 15-mill limitation is not adequate to cover such needs, additional millage may be levied only if approved by a majority of the electors voting on

the question. Const 1963, art 9, § 6. The innumerable operating millage elections conducted since *Butcher* are testimony that the 15-mill limitation is still very much alive and that it is still necessary to obtain a favorable vote of the people to levy additional millage for operating purposes.

The Legislature may impose whatever limitations it deems necessary to prevent deficit spending and the issuance of bonds and other evidence of indebtedness. Here, the proposed borrowing by the School District of Detroit was authorized by the Legislature. It is not claimed that the School District of Detroit could sell these notes without legislative authorization.

At first blush it may seem strange that while the state is constitutionally prohibited from incurring indebtedness except limited short-term borrowing or long-term borrowing for specific purposes approved by the vote of two-thirds of the Legislature and the vote of the electorate, with the exception of counties which may not incur indebtedness in excess of 10% of assessed valuation (Const 1963, art 7, § 11), *the borrowing capacity of local units of government is not limited by the Constitution.* But state constitutions are historically intended to provide limitations on an otherwise omnipotent Legislature and the Legislature in turn is expected to protect the people by appropriate legislation from deficit spending by local units of government.

The Legislature has stepped up to its responsibility in this legislation as 1973 PA 1 and 2 provide that a school district which borrows pursuant to the provisions of either act must submit its budget for review and approval to the Department of the Treasury which is authorized to take any steps necessary to assure that the school district

does not expend amounts greater than its revenues and that it maintains a balanced budget, and financial reports must be filed with the Auditor General every 30 days. MCLA 340.681(1), (10), 388.1240; MSA 15.3681(1), (10), 15.1919(640).

Legislation requiring like reporting by any school district or local unit of government facing financial difficulty might prevent some operating deficits or at least reduce their size, thereby forestalling or reducing future obligations issued to fund or refinance deficits.

We are of the opinion that the plan embodied in 1973 PA 1 and 2 violates Const 1963, art 9, § 12 insofar as it provides for the issuance of state notes, but the provision of the plan for repayment with non-voted millage of school district notes issued to fund accumulated operating deficits does not violate Const 1963, art 9, § 6.

T. E. BRENNAN, SWAINSON, LEVIN, and M. S. COLEMAN, JJ., concurred with T. G. KAVANAGH, J.

WILLIAMS, J. *(concurring in the result).* I concur in that part of my Brother T. G. KAVANAGH's opinion dealing with the first question asked this Court. I concur in the result of his opinion as to the second question but for different reasons.

The second question asked this Court follows:

"Is a school district subject to the 15 mill limitations of Section 6 of Article 9 of the Michigan Constitution of 1963 if it imposes an ad valorem tax to pay principal and interest on notes or bonds issued to fund present or projected operating deficits as provided in Section 681 of Act No. 269 of the Public Acts of 1955, as amended by Act No. 1 of the Public Acts of 1973, being sections *[sic]* 340.681 of the Compiled Laws of 1970?"

The pertinent part of Const 1963, art 9, § 6 reads as follows:

"Sec. 6. Except as otherwise provided in this constitution, the total amount of general ad valorem taxes imposed upon real and tangible personal property for all purposes in any one year shall not exceed 15 mills on each dollar of the assessed valuation of property as finally equalized. * * * These limitations may be increased to an aggregate of not to exceed 50 mills on each dollar of valuation, for a period of not to exceed 20 years at any one time, if approved by a majority of the electors, qualified under Section 6 of Article II of this constitution, voting on the question.

"The foregoing limitations shall not apply to taxes imposed for the payment of principal and interest on bonds or other evidences of indebtedness or for the payment of assessments or contract obligations in anticipation of which bonds are issued, which taxes may be imposed without limitation as to rate or amount; or to taxes imposed for any other purpose by any city, village, charter county, charter township, charter authority or other authority, the tax limitations of which are provided by charter or by general law."

The provisions of 1973 PA 1 relevant to our determination of constitutionality under art 9, § 6 are §§ 681(2) and 681(4).

Section 681(2) provides as follows:

"(2) Notwithstanding subsection (1) a district that at any time has an operating or projected operating deficit in excess of $100.00 per membership pupil may borrow a sum of not more than $75,000,000.00 and issue its negotiable interest bearing notes or bonds for the purpose of funding the deficit in accordance with this section. * * * "

Section 681(4) provides as follows:

"(4) * * * The notes or bonds shall pledge primarily

for their payment either of the following sources of revenue:

                         *   *   *

"(b) Receipts derived from the levy and collection of an ad valorem tax levied upon all taxable real and personal property within the district of not more than 2.25 mills for each year the notes or bonds are outstanding."

Determination of the impact of art 9, § 6 on § 681 causes us to revisit the leading case of *Butcher v Grosse Ile Twp,* 387 Mich 42; 194 NW2d 845 (1972). What that case really held is often lost sight of in the judicial speculation as to the ultimate impact of art 9, § 6's second and "nonapplication" paragraph on the first or "15-mill" limitation paragraph.

The opinions in *Butcher,* all of which agreed on the result and supported the actual holding, covered the whole spectrum from the conclusion that the second, "nonapplication" paragraph in effect nullified the first, "15-mill limitation" paragraph of art 9, § 6 to the conclusion that construction of the words and in fact the Constitutional Convention meant the "15-mill limitation" to have some definite meaning and not to be nullified by the nonapplication paragraph.

At one end of the spectrum Justice BLACK and three Justices spoke of nullification. He said:

"Whether the money borrowed is or is not to be used for operating expenses, 'taxes imposed' to retire all such borrowing may be levied without limit as to rate or amount, subject only to legislative restriction, if any." 387 Mich 42, 58 (1972).

At the other end of the spectrum, Chief Justice T. M. KAVANAGH held that elementary rules of

construction require the Court to find some mean-
ing in the first paragraph despite the sweeping
"nonapplication" of the second (p 71). He con-
cluded that the second paragraph's nonapplication
operates on capital outlay only, whereas the first
paragraph continues to operate on "operational
expenditures." He expressed this as follows:

"What is the net effect of our construction of Const
1963, art 9, § 6, paragraph 2, clause 1? It means that *all*
governmental units with power to tax, including those
specified in paragraph 2, clause 2, *viz.,* 'city, village,
charter county, charter township, charter authority or
other authority,' as well as unchartered units, are not
limited, either as to rate or amount, as to tax imposed
for capital outlay expenditures or bonded indebtedness,
which is approved by the voters. As to operational
expenditures, the maximum millage which may be
levied is limited either by the charter provisions for
those units subject to paragraph 2, clause 2 or to those
unchartered units and school districts subject to para-
graph 1 of section 6, in 15-18-50 millage." 387 Mich 42,
81. See also p 75.

The Chief Justice also convincingly argued
against the idea that the second paragraph wiped
out the first by noting that the Constitutional
Convention Committee expressly voted down that
idea when it refused to agree to turning all tax
limitations over to the Legislature and taking it
away from the Constitution and the vote of the
people. See particularly footnote 9, the McCauley
amendment, bottom of p 77 and top of p 78.

Two other Justices took an in-between position
with the following sentence in both the Adams and
Williams opinions:

"The limitations of the first paragraph do apply to
counties, townships and school districts, and all of the
operations of such governmental units, except for au-

thorized operations of such units involving bonds or other evidences of indebtedness or assessments or contract obligations in anticipation of which bonds were issued." 387 Mich 42, 66 and 67.

Parenthetically it may be observed that in *Alan v Wayne County,* 388 Mich 210, 316 [particularly footnote 69]; 200 NW2d 628 (1972) Chief Justice T. M. KAVANAGH's reasoning was referred to with approval.[1]

The majority opinion interpreting the nonapplication paragraph to eliminate any constitutional bonding and taxing limitation of the first paragraph relies convincingly on the construction of the actual words used in the nonapplication paragraph.

The other opinions recognize the force of such verbal construction but hold that there are other rules of construction that must also be considered. First of these is that the several parts of a constitution must be construed together to give each part meaning if possible. Second the convention history shows that a provision specifically substituting legislative for constitutional tax limitations was rejected. Third the Message to the People indicated that the 15-mill limitation was being retained. In sum, the other opinions tried to give recognition not only to the nonapplication language of the second paragraph but to the language of limitation of the first paragraph.

Since the opinion emphasizing the "nonapplication" paragraph represented the majority of the Court it is entitled to great precedential respect.

However, the actual holding in *Butcher* was much more limited than the doctrinal speculation. *Butcher* on the facts simply affirmed that the

---

1. Justice BLACK also discusses *Butcher* in his specially concurring opinion in *Alan.* He refers to the fraud of § 6.

Court of Appeals and the trial court correctly
upheld a township tax in excess of the maximum
allocated millage levied without vote of the people
to liquidate bonds issued to build a sewage system.
While not discussed in the opinions, the sewage
system was ordered by the State Health Commis-
sioner to abate a health hazard and pollution
nuisance, making the whole matter a very special
and limited one. Decision of the case, therefore,
did not on the facts require holding that the "non-
application" paragraph permitted bonding and tax-
ing within legislative limits "[w]hether the money
borrowed is or is not to be used for operating
expenses". 387 Mich 42, 58.

The decision in this case does not on the facts
require this Court to take the final plunge of
"nullification" either, although the facts require us
to examine somewhat closer to the brink.

While the second question inquires in general
terms about the constitutional validity of § 681,
1973 PA 1, this Court can take judicial notice of
the fact that the Senate's real concern is whether
the City of Detroit school system can constitution-
ally bond and tax under § 681(2) and § 681(4). The
reason such judicial notice is taken is that the
Detroit schools have an accumulated "operating
deficit in excess of $100.00 per membership pupil",
which means that this Court does not need to
consider the more speculative part of § 681(2) "or
projected operating deficit".

The significance of limiting our inquiry to the
actual accumulated "operating deficit" is that our
consideration of the "nonapplication" paragraph
is thereby limited to the consideration of bonding
and taxing for actual accumulated deficit or debt,
although derived from operations, as opposed to
the possibility of bonding and taxing for a "pro-

jected operating deficit". In short the case *sub judice* concerns bonding and taxing to help liquidate a school district's obligations rather than bonding and taxing to help a school district increase its obligations. The difference obviously is important.

Limiting our decision to the facts of the case, it is therefore possible to give recognition to the stark "nonapplication" second paragraph of art 9, § 6 and at the same time recognize the 15-mill limitation of paragraph one as to actual operations, current and future.

This opinion therefore would limit our construction of the dichotomy between paragraphs one and two of art 9, § 6 to the specific facts of this case and recognize that art 9, § 6 permits bonding and taxing without limitation for accumulated deficits, even if of operational origin, but reserve for future consideration when the facts so require whether the second, "nonapplication" paragraph of § 6, art 9 so modifies the first 15 mill paragraph as to permit bonding and taxing without limitation for current and future operations as well.

T. M. KAVANAGH, C. J. *(concurring in part and dissenting in part).* I concur in the reasoning and result reached in the opinion of Justice T. G. KAVANAGH that the plan embodied in 1973 PA 1 and 2 violates the 1963 Constitution, art 9, § 12.

For reasons set forth in my dissenting opinion in *Butcher v Grosse Ile Twp,* 387 Mich 42; 194 NW2d 845 (1972), I do not agree with the second portion of his opinion which deals with the question of whether the ad valorem tax authorized by 1973 PA 1 is subject to the millage limitation of art 9, § 6.

Admittedly, Justice KAVANAGH holds "[n]either

*Butcher* nor the nonapplication of limitation provision has nullified the 15-mill limitation. It still applies to millage to cover current operating needs of a school district".

The indebtedness which the School District of the City of Detroit is endeavoring to repay is "operating expenses". It remains an operating expense although an unpaid one. A rose is a rose is a rose is a rose. Allowing the deficit to run for more than one year does not change it from an operating expense to an operating deficit which can be paid from unvoted millage.